UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| BRIAN MAST,<br>MICHAEL WOODS,<br>EUGENE WELLS on their own behalf and<br>on behalf of a class of those similarly<br>situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>J. DAVID DONAHUE in his official<br>capacity as Commissioner of the Indiana<br>Department of Correction,<br>CRAIG HANKS in his official capacity as<br>Superintendent of the Wabash Valley<br>Correctional Facility,<br><br>      Defendants. | No. 2:05-cv-00037-JPH-DLP |

**ORDER**

On March 18, 2019, the parties filed a Stipulation to Terminate the Private Settlement Agreement Following Notice to the Class and Approval by the Court ("the Stipulated Agreement"). On June 20, 2019, the Court conducted a fairness hearing, as required under Federal Rule of Civil Procedure 23(e). For the reasons that follow, the Court finds that the Stipulated Agreement is fair, reasonable, and adequate, and **approves** the termination of the Private Settlement Agreement. Dkt. [138].

**I.
Facts and Background**

Plaintiffs are a class of prisoners who were housed in the Secured Housing Unit ("SHU") at the Wabash Valley Correctional Facility ("Wabash

1

Valley"). Their complaint sought to "[e]njoin defendants from housing mentally ill prisoners in the SHU under the conditions described in this Complaint." Dkt. 1 at 14.

### A. The *Mast Agreement*

On January 30, 2007, the parties filed their Private Settlement Agreement ("*Mast Agreement*"), dkt. 75-1, which the Court found to be fair, reasonable, and adequate under Rule 23, dkt. 104. The *Mast Agreement* prohibits, among other things, seriously mentally ill prisoners from being housed in the SHU (now called the Secured Confinement Unit "SCU") at Wabash Valley. *See* dkt. 75-1 at 2–3 (¶¶ 7–9, 11).

The *Mast Agreement* defines "seriously mentally ill" as: (1) prisoners who have a current diagnosis, or evidence, of any Diagnostic and Statistical Manual IV (DSM-IV) Axis I diagnosis or who are receiving treatment for such a diagnosis; or (2) prisoners who have been diagnosed with a mental disorder that is worsened by confinement in the SCU. *Id.* at ¶ 10.

On December 31, 2009, the case was dismissed without prejudice, subject to reinstatement by Plaintiffs or class members pursuant to the *Mast Agreement*. Dkt. 133. Since being dismissed, the *Mast Agreement* has remained in full force and effect.

### B. The *IPAS Agreement*

In 2008, the Indiana Protection and Advocacy Services Commission sued the Indiana Department of Correction ("DOC") alleging that the continued confinement of mentally ill prisoners in segregation and segregation-like

settings without appropriate mental health care and treatment violated prisoners' constitutional rights. *Ind. Prot. and Advocacy Servs. Comm'n, et al. v. Comm'r, Ind. Dep't of Corr.*, 1:08-cv-1317 (S.D. Ind.) (hereinafter "IPAS"). Following a bench trial, the Court concluded that the "Plaintiffs have prevailed as to their Eighth Amendment Claim." *IPAS*, dkt. 279 at 36.

The Court did not enter final judgment. Rather, in 2016, the parties in *IPAS* entered into a private settlement agreement (the "*IPAS Agreement*"), *id.*, dkt. 496, which the Court found to be fair, reasonable, and adequate, *id.*, dkt. 508.

The definition of "seriously mentally ill" in the *IPAS Agreement* is different from the definition used in the *Mast Agreement* as it does not include every Axis I DMS-IV diagnosis. *Id.*, dkt. 496.

The *IPAS Agreement* prohibits housing seriously mentally ill prisoners from being housed in segregation/restrictive housing (including protective custody) if they are known to be seriously mentally ill for more than thirty days. *Id.*, (¶¶ 29–30). Additionally, the IPAS Agreement requires the DOC to remove prisoners from segregation/restrictive housing (including protective custody) if they are found to be or become seriously mentally ill subsequent to such housing. *Id.* There are two exceptions to this for prisoners who: (1) are deemed too dangerous to move out of the segregation units, or (2) desire to stay in the segregation units. *Id.* (¶¶ 32–33). The plaintiffs can reinstate the case if they believe that the DOC is not complying with terms in the *IPAS Agreement*. *Id.*

The *IPAS Agreement* was scheduled to expire on March 25, 2019. *Id.* On March 18, 2019, the parties stipulated to extend the *IPAS Agreement* to the later of: a) one year from the date of the *Mast Agreement*'s termination; or b) the date this Court prevents the *Mast Agreement* from terminating. *IPAS*, dkt. 649.

### C. Class Notice

On March 18, 2019, the parties filed the Stipulated Agreement. Dkt. 138. On March 20, 2019, the Court approved the parties' proposed class notice. Dkt. 146. After the Court approved the proposed class notice, notice to the class was given as required by Federal Rule of Civil Procedure 23(e). Dkt. 152. The class originally certified does not appear to have any members because all seriously mentally ill prisoners have been removed from the SCU at Wabash Valley. The class notice therefore went to numerous prisoners who are not class members. On June 10, 2019, Class Counsel filed his report concerning comments and objections received about the proposed termination of the *Mast Agreement*[1]. Dkt. 152.

### D. Fairness Hearing

On June 20, 2019, the Court held a fairness hearing to determine whether termination of the *Mast Agreement* is fair, reasonable, and adequate. Dkt. 160. During the hearing, counsel described the steps that were taken to give notice to the class, including broadcasting the notice through the DOC's

---

[1] Following the hearing, the Court received and reviewed two additional submissions. Dkt. 161; dkt. 162.

in-house television system to all offenders, posting notice in segregation units for at least thirty days, and handing copies of the notice to individuals currently in adult segregation units. The Court found that notice was given consistent with its prior Order, dkt. 142, and consistent with the requirements of Federal Rule of Civil Procedure 23(e)(1). Dkt. 160.

## II.
## Legal Standard

The termination of a settlement agreement in a class action must be approved by the court. Fed. R. Civ. P. 23(e). "Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (quotation omitted); *see also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). Courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions," a task that is "akin to the high duty of care that the law requires of fiduciaries." *Synfuel Techs., Inc.*, 463 F.3d at 652–53 (quoting *Reynolds*, 288 F.3d at 280).

## III.
## Analysis

To determine whether a stipulation to terminate a class settlement agreement is fair, reasonable, and adequate, the Court must consider the factors set forth in *Synfuel* and in Federal Rule of Civil Procedure 23. *Synfuel* provides that the Court must consider:

5

the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.

463 F.3d at 654. Rule 23 provides that the Court shall consider the following factors:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>    (i) the costs, risks, and delay of trial and appeal;
>    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>    (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

As discussed at the Fairness Hearing, not all of the *Synfuel* and Rule 23 factors are applicable because of the unique nature of this case. But those that are applicable demonstrate that the parties' Settlement Agreement is fair, reasonable and adequate and thus weigh strongly in favor of approving it.

First, class counsel, Kenneth Falk of the ACLU of Indiana, is competent and has adequately represented the class. Mr. Falk has represented the classes in both *Mast* and *IPAS* since their inception and thus has command of the facts and issues presented in both cases. He has demonstrated a deep understanding of the concerns regarding termination of the *Mast Agreement* expressed by individuals who submitted comments. *See* dkt. 152. Mr. Falk

6

has demonstrated a similarly thorough understanding of the benefits that inure to the classes under the *IPAS Agreement* and the *Mast Agreement* as well as the relative benefits of allowing the *Mast Agreement* to continue versus the immediate lapse of the *IPAS Agreement*. Second, Mr. Falk is not receiving any fees for his work on the dismissal of the *Mast Agreement*. Third, the negotiations between the parties were made in good faith and conducted at arm's length.

The most important factor though is whether the relief provided for the class is adequate. In other words, does the class benefit if the *Mast Agreement* (which would otherwise continue indefinitely) is terminated in exchange for a one-year extension of the *IPAS Agreement*? The Court finds it does because termination of the *Mast Agreement* in exchange for a one-year extension of the *IPAS Agreement* is more beneficial to the intended class members than allowing the *IPAS Agreement* to immediately lapse so the *Mast Agreement* can continue indefinitely.

While there has been some opposition from prisoners to the proposal to terminate the *Mast Agreement*, the relative benefits of the parties' agreement must be assessed in light of the reality that the class originally certified does not appear to currently have any members as all seriously mentally ill prisoners have been removed from the SCU at Wabash Valley. The Court thus considers the benefits that approving the parties' agreement may bring to the broader class of intended beneficiaries of the *Mast Agreement*, that is, seriously

mentally ill prisoners who may suffer harm as a result of being placed in any segregated housing for an extended period of time. Dkt. 1 at 4–9 (¶¶ 22–57).

The *IPAS Agreement* is broader in scope than the *Mast Agreement* because, unlike the *Mast Agreement* which is limited to the Wabash Valley, it applies to all DOC facilities. The *IPAS Agreement* thus prevents all seriously mentally ill prisoners in the DOC's custody from being housed for extended periods of time in segregated/restrictive housing, subject to the limited exceptions based on dangerousness and voluntariness described elsewhere in this Order.

In addition to being broader in scope and benefitting more prisoners, the *IPAS Agreement* gives Mr. Falk the ability to monitor the DOC's handling of seriously mentally ill prisoners. *IPAS*, dkt. 496 (¶ 61). Under the *IPAS Agreement*, Mr. Falk is notified of each seriously mentally ill prisoner that has a change in diagnosis or is reclassified and then moved into segregation within a six-month period. *Id.* (¶¶ 39–40). Mr. Falk would not have access to this information if the *IPAS Agreement* were immediately terminated as the *Mast Agreement* does not contain a comparable information-sharing/monitoring provision.

Many current and future DOC prisoners will benefit from the broader scope and monitoring provision of the *IPAS Agreement* so long as the *IPAS Agreement* is operative. In contrast, the continued operation of the *Mast Agreement* will most likely not benefit any current or future DOC prisoner. Similarly, termination of the *Mast Agreement* will most likely not cause harm to

those who this lawsuit was intended to benefit or result in seriously mentally ill prisoners being sent to the SCU at Wabash Valley. Moreover, the *IPAS Agreement's* definition of "seriously mentally ill prisoners" is broad enough to include any mentally ill prisoners' whose health is at risk in segregation.

Although the *Mast Agreement* does not include the same exceptions as the *IPAS Agreement,* the *IPAS Agreement* still requires "dangerous" segregated seriously mentally ill prisoners to be monitored by mental health professionals. *IPAS,* dkt. 496 (¶¶ 32–36). At the fairness hearing, Mr. Falk indicated that there are currently fifteen seriously mentally ill prisoners that the DOC has determined to be too dangerous to move out of segregation.[2] Under the *IPAS Agreement,* Mr. Falk receives periodic reports on those prisoners. *Id.* (¶ 32).

The Court also considers that the objectives of the *Mast* litigation have been achieved through the combination of the *Mast* and *IPAS* cases. As noted above, it appears there are no current members of the class defined in this case. More broadly, the DOC has ended the practice of housing seriously mentally ill prisoners in restricted units for more than thirty days, except where the prisoners choose to stay in those units or are deemed too dangerous to be moved from the units. This applies throughout the DOC, not just at Wabash Valley.

---

[2] Measures reasonably taken to protect inmates and staff from dangerous mentally ill prisoners may unavoidably aggravate their psychoses; in such a situation, the measures would not violate the Constitution. *Scarver v. Litscher,* 434 F.3d 972, 976 (7th Cir. 2006).

9

Overall, the systemic resolution set in motion by the *Mast* litigation and *Mast Agreement* has been continued and enhanced by the *IPAS Agreement*. The *IPAS Agreement* requires seriously mentally ill prisoners to receive "minimum adequate treatment" while housed in DOC facilities. *IPAS*, dkt. 496 at 15–16 (¶ 47). This treatment includes individualized treatment plans that are subject to review every ninety days; at least ten hours of therapeutic programming each week; and recreation and showers consistent with DOC policy. *Id.* In addition, prisoners may be provided with additional out-of-cell time. *Id.*

The *IPAS Agreement* requires the development of new placements for seriously mentally ill prisoners formerly in segregated confinement. The treatment unit at Pendleton Correctional Facility ("Pendleton") was started because of the *IPAS* litigation and has been an integral part of the *IPAS Agreement*. Although part of the unit at Pendleton Correctional Facility was destroyed in 2018, continuing the *IPAS Agreement* will allow Plaintiffs' counsel to monitor the redevelopment programming and services.

The *IPAS Agreement* also guarantees that prisoners housed in DOC facilities receive credit for their time in the mental health units. *IPAS*, dkt. 496 at 18–19 (¶ 49). Each day in the mental health unit is treated as one less day of disciplinary confinement. *Id.* Similarly, under the *IPAS Agreement*, the DOC considers a prisoner's mental health before disciplining the behavior. *Id.* at 20 (¶ 53).

Last is the question of what happens to seriously mentally ill prisoners when the *IPAS Agreement* expires. While there will no longer be an agreement in place that is subject to monitoring and enforcement by the Court, the DOC has expressed commitment to maintaining the systemic changes already implemented that effect how it houses and treats seriously mentally ill prisoners. While only time will tell if that is the case, the Court has no reason to doubt these representations made by the DOC. Moreover, the Court's written order following the *IPAS* trial identifies the circumstances that were found to violate the Eighth Amendment in the context of housing and treating mentally ill prisoners. *IPAS*, dkt. 279. That order thus provides clear guidance to the DOC and could be invoked as precedent, if necessary, should similar circumstances reemerge within the DOC.

## IV.
## Conclusion

Extending the operation of the *IPAS Agreement* will bring immediate, concrete benefits to many current and future DOC prisoners with serious mental illness. In contrast, the continued existence of the *Mast Agreement* would likely bring very little benefit to very few, if any, DOC prisoners.

The agreement to terminate the *Mast Agreement* is fair, reasonable, and adequate. The parties' Stipulated Agreement is acknowledged and allowed to take effect. A separate order closing the case shall now issue.

**SO ORDERED.**

Date: 7/23/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Elizabeth Alexander
NATIONAL PRISON PROJECT OF THE ACLU
ealexander@npp-aclu.org

David A. Arthur
INDIANA ATTORNEY GENERAL
David.Arthur@atg.in.gov

Richard M. Bramer
INDIANA ATTORNEY GENERAL
Richard.Bramer@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

David C. Fathi
NATIONAL PRISON PROJECT OF THE ACLU
dfathi@npp-aclu.org

Todd A. Weaver
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
todd.weaver@dgslaw.com